[676 NYS2d 559]

Aetna Casualty & Surety Co., Respondents, v Kidder, Peabody & Co. Incorporated et al., Appellants, et al., Defendants.

First Department, August 6, 1998

### APPEARANCES OF COUNSEL

*Arthur N. Lambert* of counsel (*Daniel W. White* on the brief; *Lambert Weiss & Pisano*, attorneys), for Aetna Casualty & Surety Co. and another, respondents.

*David N. Wynn* of counsel (*C. Stephen Heard, Jr., Jeffrey W. Berkman, Mark P. Monack* and *Michael S. Cryan* on the brief; *Arent Fox Kintner Plotkin & Kahn*, attorneys), for Vigilant Insurance Company, respondent.

*Robert B. Budelman, Jr.*, of counsel (*Jeffrey M. Winn* and *Jay L. Taylor* on the brief; *Sedgwick, Detert, Moran & Arnold*, attorneys), for all other respondents.

*Peter J. Kalis* of counsel (*Thomas M. Reiter, Thomas J. Smith, Ellen R. Nadler, Mark J. Headley, Eric A. Tirschwell* and *Jennifer L. Meyerhardt* on the brief; *Kirkpatrick & Lockhart, L. L. P.*, and *Kramer, Levin, Naftalis & Frankel*, attorneys), for appellants.

*John F.X. Peloso, John E. Failla, Nora von Stange, Stuart J. Kaswell* and *Fredda L. Plesser* of counsel (*Morgan, Lewis & Bockius, L. L. P.*, and *The Securities Industry Association*), for The Securities Industry Association, *amicus curiae*.

### OPINION OF THE COURT

Tom, J.

This is an action by plaintiff insurers seeking a declaration that they are not obligated to indemnify defendant insureds under the terms of numerous fidelity bonds issued by the insurers for the insureds. The issue before us is whether the securities brokerage firm of Kidder, Peabody & Co. is covered under the fidelity bonds for third-party claims arising out of the misconduct of its employee in divulging confidential information relating to corporate takeovers and mergers of Kidder's

clients, which resulted in massive insider trading and losses to third parties.

The transactions giving rise to the claimed losses arose from the multiple insider-trading schemes perpetrated by Ivan Boesky, Martin Siegel and others during the 1980's. During that time period, defendant Kidder was a broker-dealer registered with the Securities and Exchange Commission which provided a broad range of investment banking and financial services to its clientele. Martin Siegel was employed by Kidder from 1971 through 1986 as a mergers and acquisitions specialist. Ivan Boesky was a Kidder customer and a arbitrageur who traded in securities of companies involved in corporate takeovers.

From 1982 through 1986, Siegel was involved in two insider-trading schemes that resulted in losses to Kidder giving rise to the instant action. In 1983, Diamond Shamrock, a Dallas-based oil and gas company, retained Kidder to provide financial advice regarding a proposed hostile acquisition of Natomas Company, a San Francisco-based oil and gas company. Siegel informed Boesky of the contemplated tender offer for Natomas before the information became public. Siegel received from Boesky payments of approximately $700,000 for disclosure of tender offers involving Kidder clients including the proposed acquisition of Natomas. Based on this inside information, Boesky purchased a substantial position of common stock of Natomas. The hostile tender offer by Diamond Shamrock eventually resulted in a friendly merger with Natomas, and Boesky realized a huge profit when he sold the Natomas securities.

During this period of time, Siegel also exchanged inside information with Robert Freeman, a general partner of Goldman Sachs & Company, concerning certain mergers, acquisitions, and leveraged buyouts. Siegel used this information to assist Kidder's Risk Arbitrage Department to make illegal trades, which realized millions of dollars in profit for Kidder.

In 1986, the Federal Government investigated insider trading on Wall Street and uncovered the illegal activities of Kidder, Siegel, Boesky and Freeman. On February 13, 1987, Siegel pleaded guilty to violating the securities laws by obtaining inside information from Goldman Sachs, and using the illegal information for trades made by Kidder's Risk Arbitrage Department. Boesky pleaded guilty to criminal violation of securities laws and disgorged illegal profits to the Federal Government totaling $100,000,000.

In the aftermath of the Federal Government's investigations, Kidder was sued in various class actions. The plaintiffs in these actions were public shareholders of companies that were the subject of Kidder's insider trading; they alleged that they would not have sold at the prices at which the securities were sold if they had the same insider information. In the settlement of these actions, Kidder agreed to pay $7,633,000 and $13,000,000 in damages and $7,045,000 in attorneys' fees and costs. In a separate settlement involving Diamond Shamrock's tender offer for Natomas (the Maxus settlement), Kidder agreed to pay the sum of $165 million in two components: a straight cash payment from Kidder of $125 million and $40 million payment for warrants to purchase up to 8 million shares in Maxus common stock. In the Maxus litigation it was claimed that Boesky, using inside information from Siegel, purchased over $12 million worth of Natomas stock, driving up the price of the shares, and resulting in an unfair stock exchange ratio when a friendly merger subsequently was reached. These are the losses for which Kidder sought coverage from plaintiff insurers under the fidelity bonds.

In March of 1993, Kidder submitted a proof of loss statement to the fidelity insurers. Kidder sought recoupment of the bonds' limits for the amounts it paid in the securities action settlements and the attorneys' fees it had incurred in defense of the class actions.

The insurers then commenced this action to obtain a declaration of rights as to whether Kidder is covered for the losses under the bonds. Among the arguments raised in the amended complaint against coverage were: that the bonds are not liability policies and therefore do not cover losses sustained by noninsureds third parties (fifth cause of action); that the bonds provide coverage for "direct losses" or "direct compensatory damages" only, and not for consequential or incidental losses (sixth cause of action); that the bonds provide coverage only where the employee had the "manifest intent to cause the insureds to sustain the loss" (seventh cause of action); and that the bonds provide coverage only where the losses have been "solely and directly" caused by the employee's misconduct (eighth cause of action).

Kidder counterclaimed for breach of the insurance contracts based upon the insurer's refusal to honor its claim and for restitution of the premium payments. Kidder asserted that the losses were a direct result of its employee's fraudulent acts, which were undertaken with the intent to convert Kidder's and its clients' proprietary information.

The insurers moved to dismiss Kidder's breach of contract counterclaim and for partial summary judgment on their claim for declaratory relief with respect to the fifth, sixth and eighth causes of action, i.e., no coverage for third-party claims, no coverage for indirect or consequential losses, and no coverage for losses not caused "solely and directly" by the faithless employee. Kidder cross-moved for partial summary judgment dismissing the foregoing causes of action.

■ The motion court found that the terms of the fidelity bonds were not ambiguous and that the fidelity coverage did not insure Kidder for losses resulting from liability for the third-party claims against it, reasoning that the bonds' "direct loss" language required this result. The court further found that coverage was barred by the exclusion limiting coverage to "direct compensatory damages," insofar as the damages that resulted from Kidder's settlement of the Maxus class action asserting excessive stock purchase claims, and from attorneys' fees, were consequential rather than direct. The court granted plaintiffs partial summary judgment, declaring that the bonds did not cover the losses claimed, and dismissed defendants' counterclaim. Defendant insureds appeal from the motion court's order and we now affirm.

Kidder's 1993 proof of loss statement seeking indemnification characterized its losses as resulting from the dishonest and fraudulent acts of its faithless employee, Siegel. Whether Siegel was a "faithless" employee within the meaning of the fidelity bonds, though, is the point squarely in dispute. This litigation also requires a clear definition of what fidelity bonds historically have been understood to be, and what they are not.

The various bonds, consisting of primary coverage bonds and two excess layers of coverage, were issued in 1986 with coverage of $50 million and a $5 million deductible. They are blanket bonds, which basically means that all employees, rather than named employees, are covered (see, 7 Couch, Insurance 3d § 100:1, at 100-4). All of the bonds start with a general statement of purpose, that the purpose of the agreements incorporated therein is "to indemnify and hold harmless the insureds" against risks specified elsewhere in the bonds. The bonds then specify six areas of coverage: fidelity losses caused by dishonest or fraudulent acts of an employee of the assured; on-premises losses or damage to the insureds' property caused by robbery, burglary, or theft; similar types of losses occurring in transit; forgery or losses by the insureds resulting from alterations; the insureds' securities losses; and the insureds'

losses resulting from counterfeit currency. Basically, these are distinct property-type losses, subject to several exclusions set forth in riders (*see*, Rider 22 in Lloyd's bond) that trigger indemnification by the insurers.

The covered risks must be read with the riders, more particularly defining the risks, and with the exclusions. The primary layer bonds are typified by the Lloyd's Standard Form No. 14 blanket bond. Insofar as the employee's fidelity, which is the only claim in issue here, is covered, the bond extends coverage for a specific type of risk:

"[A] Loss resulting solely and directly from one or more dishonest or fraudulent acts by an Employee whether committed alone or in collusion with others, which are acts committed by the Employee with the *manifest intent*

"[a] to *cause the insureds to sustain such loss*, and

"[b] to obtain thereby an improper personal financial benefit for the Employee, and which acts in fact result in the Employee obtaining such benefit. Salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits shall *not* constitute improper personal benefit." (Emphasis added.)

The excess layer bonds are typified by the National Union Fire Insurance Company bond, insofar as the fidelity provision is invoked, and cover:

"[A] Loss resulting directly from one or more dishonest or fraudulent acts of an Employee, committed anywhere and whether committed alone or in collusion with others, including loss of property resulting from such acts of an Employee, which property is held by the Insureds for any purpose or in any capacity and whether so held gratuitously or not, and whether or not the Insureds is liable therefore.

"Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the *manifest intent*:

"[a] *to cause the Insureds to sustain loss*, and

"[b] to obtain financial benefit for the Employee, or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pension, or other employee benefits earned in the normal course of employment." (Emphasis added.)

This rider also contains an exclusion in this regard for "all damages *of any type* for which the insureds is *legally liable*,

except *direct compensatory damages* arising from a loss covered *under this bond.*" (Emphasis added.)

Between these slightly different types of coverage, there is much common ground: by their clear terms, the fidelity bonds require that the unfaithful employee must intend to cause the employer a loss directly and solely relating to the faithless act, classically describing embezzlement or another type of theft from the employer (*Glusband v Fittin Cunningham & Lauzon,* 892 F2d 208) or even retaliation against an employer that benefits a third party in collusion with the employee (*see, General Analytics Corp. v CNA Ins. Cos.,* 86 F3d 51). An embezzler, at one end of the continuum, necessarily intends to cause the employer the loss, since the employee's gains are directly at the employer's expense (*First Natl. Bank v Lustig [Lustig I],* 961 F2d 1162). At the other end of the continuum, not triggering fidelity coverage, is the situation where the employee's dishonesty at the expense of a third party is intended to benefit the employer, since the employee's gain results from the employer's gain. Under such circumstances, even if the employer suffers a loss, fidelity coverage is not triggered (*supra;* *Municipal Secs. v Insurance Co.,* 829 F2d 7). Occasionally, intent with regard to the employer's loss presents a factual issue (*First Natl. Bank v Lustig [Lustig I], supra*), not present in this case. There is no evidence at all that the employee's manifest intent here was to cause the employer a loss (*Glusband v Fittin Cunningham & Lauzon, supra*).

■ Nor is coverage triggered by the nature of the loss, under the clear exclusions of the bonds. The bonds specifically exclude "damages of any type for which the insureds is legally liable, except *direct compensatory* damages arising from a loss *covered under this bond*" (emphasis added). Under New York law, compensatory damages are "either general (direct) damages * * * or special (consequential) damages" such as a third party's lost profits (*Vitol Trading v SGS Control Servs.,* 874 F2d 76, 79). A direct loss for insurance purposes has been analogized with proximate cause (*Sorrentino v Allcity Ins. Co.,* 229 AD2d 481; *Granchelli v Travelers Ins. Co.,* 167 AD2d 839). The distinction in the nature of the losses is critical for our purposes. Those terms in the fidelity bonds do not describe indirect and consequential injuries to the employer resulting from legal settlements with third parties who were the actual targets of the employee's acts. In this sense, the insureds' replacement of funds embezzled by the employee from a customer's separate personal bank account maintained by an-

other institution was not a direct loss to the insureds/employer (*Lynch Props. v Potomac Ins. Co.*, 962 F Supp 956, affd 140 F3d 622). Finally, in this regard, the putative loss to Kidder arises in part from a settlement with third parties, but the settlement was not the direct result of the employee's dishonest conduct; the employee's dishonesty only caused pricing irregularities in the stock, which, themselves, caused losses to the customers, which then led to litigation concluding in settlement. In this sense, the settlement would not constitute a covered loss (*Continental Corp. v Aetna Cas. & Sur. Co.*, 892 F2d 540). The logical extension of Kidder's argument, that settlement with a third party under the factual circumstances of this case constitutes a direct loss to the insureds, would create the potential for almost any loss, not initially direct to the insureds, to become a direct loss, a subterfuge that would render the exclusion in this case clearly meaningless.

▪ The insureds' argument that the motion court erred in concluding that the bonds cannot cover third-party losses misconstrues the ruling. The bonds' other coverage terms compensate the insureds for third-party losses in connection with the insureds' loss of their property, such as securities and records (*see*, Rider No. 14, § 5) or precious metals (*see*, Rider No. 3), but those are distinct provisions not triggering fidelity coverage under provision [A], and the insureds' claims do not arise under those other provisions.

There also are exclusions specific to trading-type losses (§ 2 [I]), and for losses resulting from violations of securities laws and rules by employees that describe the third parties' losses in this case. An exception to the exclusion operates if a loss otherwise covered by the bond would have occurred notwithstanding a violation (*see*, Rider No. 14, § 2 [f], as amended by Rider No. 16). A fair reading of this latter phrasing is that if there is a compensable loss (i.e., it arises from a covered risk) to the insureds, the insurer may not rely on a possible illegality as a means of avoiding coverage. Parenthetically, the "losses" in this case would not have occurred but for Siegel's illegalities, so that the exception to the exclusion would not apply.

Kidder argues that the attorneys' fees provisions in the bonds either directly infer broad third-party coverage, or are so inconsistent with the statement of risks covered that the inconsistency must be construed in favor of the insureds to create coverage. These arguments are unavailing. The attorneys' fees provisions are carefully couched in terms of the bonds' basic

coverage. That is, if there is a "a collectible loss *under this bond*" (emphasis added) or "a valid and collectible loss sustained *by the insureds* under *the terms of this bond*," then Kidder would be indemnified for costs and fees incurred in defending a suit against a third party. This provision is applicable in terms of the risks for which coverage specifically applies vis-à-vis third-party property held by the insureds. The provision neither extends the covered risks to third-party claims, *carte blanche*, nor is inconsistent with the general terms of coverage.

The foregoing analysis of the subject fidelity bonds comports with the history of these standard form documents and relevant case law.

It has long been recognized that fidelity bonds cover only losses within one of the designated areas of risk (13 Couch, Insurance 2d § 46:13). Historically, "fidelity guaranty contracts" were more akin to surety agreements than to insurance or guarantees (for distinctions, *see*, 1 Couch, Insurance 3d §§ 1:16—1:18), although the terms "insureds" and "insurer" commonly are used. Stockbrokers' blanket bonds were one of the major types of fidelity bonds, guaranteeing the honesty of an employee hired in a position of trust with respect to the employer. Hence, a "blanket dishonesty bond" historically "unambiguously cover[ed] only the insured against the defalcation of its employees. A plaintiff who has recovered a judgment against the insured * * * is not a third-party beneficiary" (13 Couch, Insurance 2d § 46:2, at 12). Basically, even when the employee was engaged in third-party transactions, coverage arose because the employee placed the customer's interests ahead of the employer's, causing a direct loss to the employer (13 Couch, Insurance 2d § 46:50), conduct manifestly not present in this case, or the employee acted in breach of the employee's duty of fidelity to the employer (13 Couch, Insurance 2d § 46:54). The employee's intent was to cheat the employer and benefit himself or a collusive third party (13 Couch, Insurance 2d § 46:55). These meanings retain relevance, requiring indemnification to the employer for personal loss caused by an employee holding a position of trust, where the insurer's liability is primary and direct (1 Couch, Insurance 3d § 1:16).

Memoranda generated by the insurance industry and stock exchanges in connection with the industry-wide drafting of the standard blanket fidelity policies over the last 30 years, demonstrating the significant discussion of standard coverage pro-

visions by organized groups of underwriters as well as insureds, also reflect these meanings. The standard-form bonds that provided the basic language of the present bonds were drafted during the 1970's. At that time, a joint committee of the stock exchange and insurance industry communities reviewed fidelity bonding concerns in light of claims by underwriters that the increasing loss ratio of the bonds was reducing the attractiveness of fidelity coverage (New York Stock Exchange Informational Memo No. 77-41, Oct. 7, 1977). The expressed intent of the underwriters was to refine the exact meaning of employee dishonesty under the bonds as a means of addressing judicial decisions expanding coverage beyond that originally contemplated, while ensuring that employers who had the misfortune of hiring potential embezzlers (although not necessarily limited to embezzlement) could purchase such protection. The point was to protect employers from employee thieves who steal from the employers, but not from the consequences of unauthorized trading activity, for which other coverage could be purchased (*see,* Weldy, *A Survey of Recent Changes in Financial Institution Bonds,* Surety Association of America, 12 Forum 270 [fall 1976]). Other memoranda indicate that fidelity coverage also contemplated risks of loss to the employer resulting from the employee's theft or misappropriation of a third party's property, such as securities or funds, in the physical possession or custody of the employer (*see,* New York Stock Exchange Informational Memo No. 82-29, Apr. 29, 1982). The standard terms of coverage and exclusions therefrom were discussed again between both communities during the early 1980's in order to further refine these terms. The renewed negotiation led to several standard-form riders, including those relevant in this case. Nothing in the history of these particular bonds, which comports with an historical understanding of what fidelity coverage is, indicates that the employee infidelity being covered as a risk could reach the employee's dishonesty toward third parties, absent an intent to cause a loss to the employer.

New York's limited case law on the subject supports our conclusions. The Court of Appeals (*175 E. 74th Corp. v Hartford Acc. & Indem. Co.,* 51 NY2d 585) has made clear that a fidelity bond is not a liability policy within the meaning of the Insurance Law. The difference turns on what is defined as the risk. Insurance covers the liability of the insureds to a third party, while fidelity bonding covers the loss of property owned by the insureds or held by the insureds, as a consequence of employee

dishonesty. Third-party claims arise only within this specific context: the employee acted dishonestly and property is taken from or lost by the insureds/employer that has custody of the property. The procedural distinctiveness of the *175 E.* case, in which the third-party owner of funds tried to sue the underwriter directly for misappropriation of its funds by an employee of the bankrupt employer, does not detract from its clear articulation of the limits of fidelity coverage: "the loss occurs when money or other covered property is misappropriated from the insured, irrespective of the capacity in which the insured holds it * * *. That the insured may be liable to a third party for a loss of money resulting from employee dishonesty does not transform a policy covering the insured against a direct loss into one indemnifying against liability" (*supra,* at 593; *accord, Glusband v Fittin Cunningham & Lauzon, supra*).

Two rulings of New York County Supreme Court also well illustrate the distinctions, even if, as Kidder notes, both also turned on different issues. In one, the court focused on the fidelity bonds' "key words" of "manifest intent" to cause the employer a loss (*Continental Bank v Aetna Cas. & Sur. Co.,* 164 Misc 2d 885, 888), finding no coverage arising from the employees' unauthorized trades in customer accounts to corner the market in a certain stock. That court noted that "[t]he last thing they wanted was for their scheme to fail. * * * The manifest intent of these scoundrels was to make money, not to cause [the employer] to lose money" (*supra,* at 888), an observation presently pertinent. Another court noted in a similar vein that the dishonest stockbrokers "did not steal *from* the company, they stole *for* the company" (*Drexel Burnham Lambert Group v Vigilant Ins. Co.,* 157 Misc 2d 198, 209). Although many factual circumstances distinguish *Drexel* from the present case, the nature of fidelity coverage also was in issue there. However, there too, misuse of confidential information was not the equivalent of monetary theft triggering fidelity coverage. Hence, both the nature of the loss and the employee's lack of intent to cause the employer insureds that loss defeat coverage here.

Accordingly, the orders of Supreme Court, New York County (Ira Gammerman, J.), entered September 24 and 30, 1996, granting plaintiffs' motion for partial summary judgment declaring that there is no coverage for defendants' claimed loss, granting the motion dismissing defendants' counterclaim sounding in breach of contract, and denying defendants' cross motion for summary judgment dismissing the complaint and

affirmative defenses to the breach of contract counterclaim, should be affirmed, without costs.

MILONAS, J. P., RUBIN and MAZZARELLI, JJ., concur.

Orders, Supreme Court, New York County, entered September 24 and 30, 1996, affirmed, without costs.