FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Union Savings Bank, Plaintiff–Appellee,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., doing business as National Union Fire Insurance Company, Defendant–Appellant.

Docket No. 99–7357

United States Court of Appeals, Second Circuit.

Argued Oct. 25, 1999

Decided March 2, 2000

68

Ronald H. Alenstein, New York, N.Y. (Victor F. Mustelier, Stephen F. Willig, D'Amato & Lynch, of counsel), for Defendant–Appellant.

Alan T. Gallanty, New York, N.Y. (Twomey, Hoppe & Gallanty, LLP; Ann S. DuRoss, Assistant General Counsel, Robert D. McGillicuddy, Supervisory Counsel, Roberta H. Clark, Counsel, Federal Deposit Insurance Corporation, Washington, DC, of counsel), for Plaintiff–Appellee.

Before: POOLER, FEINBERG and OAKES, Circuit Judges.

OAKES, Senior Circuit Judge,

The Federal Deposit Insurance Corporation (the "FDIC"), as receiver for Union Savings Bank (the "Bank"), filed this action against National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), seeking recovery under a fidelity bond indemnifying the Bank for damages caused by dishonest and fraudulent acts by employees. The United States District Court for the Southern District of New York (Loretta A. Preska, *Judge* ) granted summary judgment to the FDIC and awarded the liability permitted under the bond, plus interest. This appeal by National Union followed. Because we agree with the district court that the FDIC has established as a matter of law that the fidelity bond indemnifies the Bank for its loss, we affirm the judgment of the district court.

## BACKGROUND

T. John Folks, III, was a Trustee of the Bank from 1974 to 1992. Folks served on the Bank's Mortgage and Real Estate Committee, responsible for guiding and protecting the Bank in real estate ventures, from at least 1982 to 1992.

In 1985, the Bank entered into a limited partnership agreement with Micrad Corporation, an entity owned by Seymour Diesenhouse, and formed Hampton Vistas Associates ("Hampton Vistas").[1] Unbeknownst to the Bank, Folks was a partner with Diesenhouse in two separate real estate ventures. Diesenhouse was hired to serve as the construction manager for the Hampton Vistas project.

The purpose of the Hampton Vistas partnership was to develop condominium units at the Rock Hill Golf and Country Club in Brookhaven, New York. The Bank agreed to loan $5 million to Hampton Vistas and had a right of first refusal as to any further construction loans for the project.

In late 1987, three of Diesenhouse's employees, on separate occasions, told Folks that Diesenhouse was engaging in improper and illegal activities in his real estate projects. John DiPietro, an employee of the Hampton Vistas project, and Michael DeChiaro, the construction supervisor and

1. The Bank owned a 48 percent share in Hampton Vistas, Micrad Corporation owned 50 percent, and Victus, a wholly-owned subsidiary of the Bank, owned the remaining 2 percent share.

project manager of Hampton Vistas, testified under oath that they informed Folks that Diesenhouse was stealing from the project. The activities Diesenhouse was involved in included stealing, taking kickbacks from contractors, overbilling, forging checks, fabricating IRS 1099 forms, and using the Bank's funds to pay personal expenses. Robert Levitas, a business partner of Folks, also testified under oath that he was told by DeChiaro on more than one occasion of allegations of improprieties by Diesenhouse, and that he discussed these allegations with Folks.

Diesenhouse eventually pleaded guilty in 1994 to criminal charges of conspiracy to commit bank fraud, and admitted to soliciting bribes and demanding kickbacks from subcontractors on the Hampton Vistas project after 1991. In his plea, Diesenhouse admitted to directing subcontractors to submit inflated invoices for payment to the Hampton Vistas project which, in turn, were submitted by Diesenhouse to the Bank in order for the subcontractors to kick back monies to Diesenhouse.

Neil Scuderi and Robert Sullivan, employees on the Hampton Vistas project, testified that they knew that DeChiaro and DiPietro planned to tell Folks about Diesenhouse, and that the conversation with Folks indeed had taken place. In addition, Diesenhouse testified that in or about November 1987 he met and discussed with Folks the allegations made against him, and Folks told him on that occasion that he had been informed. Folks, when asked in his deposition whether he was told of Diesenhouse's wrongdoing, did not deny that he was told but merely testified that he could not "recall" or "recollect" discussing these allegations.

Three witnesses also testified that when Folks learned of Diesenhouse's wrongdoing, Folks took actions to protect his own interest in the projects that he shared with Diesenhouse. Specifically, Folks took control of checking accounts away from Diesenhouse, set up an accountant and bookkeeper on one of the other shared partnerships, and put other people in control of those projects. Folks did not, however, take the checkbooks for Hampton Vistas—the Bank's project—away from Diesenhouse nor did he inform the Bank of Diesenhouse's wrongdoing.

Beginning on December 22, 1987, the Bank loaned and advanced an additional $8 million to the Hampton Vistas project. The additional notes which originated in 1987 through 1990 were approved by the Bank's Mortgage and Real Estate Committee, of which Folks was a member. Three of the Bank's trustees submitted affidavits swearing that had Folks disclosed to the Bank the allegations regarding Diesenhouse, a full investigation would have been pursued, Diesenhouse would have been removed, and all further funding to Hampton Vistas would have ceased to the extent permissible. Folks testified that he would also have recommended immediately ceasing any further funding to the project if he had been told of the same allegations.

Ultimately, the Hampton Vistas project failed after four years of delays in construction and sales due, the FDIC asserts, to the negligence of the Bank's counsel in its zoning and title work. Specifically, Hampton Vistas did not acquire zoning approval to build housing units on the property until April of 1988. Even then, the project was scaled down significantly from 266 condominiums to final approval for a 136 townhouse project. Between 1985 and 1991, the partnership constructed and sold only 65 of the initially-planned 280 units, 26 of which were partially constructed units sold by auction. The remaining units were not built.

In June of 1991, the Bank consented to an order by the FDIC to cease and desist from unsafe and unsound business practices. In the spring of 1992, the Bank discovered Folks's undisclosed relationship with Diesenhouse, and he was asked to resign as a trustee. The Bank was closed by the New York Superintendent of Banks

in 1992, and the FDIC was appointed receiver.

Of the approximate $8 million in funds advanced after December 1987, amounts in excess of the bond's limit, $3 million, were never repaid to the Bank. The FDIC sought to recover the Bank's losses under a fidelity bond issued by National Union. The FDIC filed its proof of loss with National Union on November 12, 1992, for the full amount of the bond's coverage.

National Union refused to provide coverage and this litigation followed. After extensive discovery, the FDIC filed a motion for summary judgment. The district court granted the FDIC's motion for summary judgment, finding that the FDIC established as a matter of law that the fidelity bond indemnified the bank for its loss.

## DISCUSSION

### I. Summary Judgment Principles.

Summary judgment may be granted only if there is no genuine issue of material fact to be tried and the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When determining whether there is a genuine issue of fact to be tried, the court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, in this case National Union. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Taggart v. Time Inc.*, 924 F.2d 43, 46 (2d Cir.1991). We review a district court's determination that there is no genuine issue of material fact *de novo*. *See Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).

### II. The Fidelity Bond.

Although the FDIC is a party to this suit, recovery under the bond in this case is determined under principles of New York law. *See In re J.T. Moran Fin. Corp.*, 147 B.R. 335, 339 (Bankr.S.D.N.Y. 1992); *see also Federal Deposit Insurance Corporation v. Oldenburg*, 34 F.3d 1529, 1538 (10th Cir.1994). Pursuant to the fidelity portion of the bond, National Union agreed to indemnify the Bank for:

(A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a) to cause the Insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions . . . .

Section 2(d) of the bond's Conditions and Limitations section provides that the bond covers acts of any Trustee of the Bank while acting as a member of any committee appointed "to perform specific, as distinguished from general, directorial acts on behalf of the [Bank]." Therefore, to recover under the fidelity provision of the Bond, the FDIC must have presented sufficient evidence that Folks committed dishonest or fraudulent acts, with a manifest intent to harm the Bank and benefit himself, that directly caused the Bank's loss.

### A. Dishonest Acts.

The evidence is sufficient to show as a matter of law that Folks committed dishonest acts within the meaning of the fidelity bond. Dishonesty, as understood in a fidelity bond, need be proven only by a preponderance of the evidence. *See Leucadia, Inc. v. Reliance Ins. Co.*, 864 F.2d 964, 971–72 (2d Cir.1988). Hence, to determine whether the district court granted summary judgment, we must decide whether a rational jury could find that the

FDIC failed to prove by the preponderance of the evidence that Folks committed a dishonest act. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The failure to disclose fraudulent conduct that pertains to a loan is a dishonest act under a fidelity bond. *See Oldenburg,* 34 F.3d at 1535–41; *First Nat'l Bank of Louisville v. Lustig,* 961 F.2d 1162, 1166 (5th Cir.1992); *Interstate Prod. Credit Ass'n. v. Fireman's Fund Ins. Co.,* 944 F.2d 536, 539–41 (9th Cir.1991). The record demonstrates that Folks knew that Diesenhouse was stealing from Hampton Vistas and did not inform the Bank of Diesenhouse's wrongdoing, thereby failing to prevent the Bank from issuing further loans to the project. The fact that Folks was told of Diesenhouse's wrongdoing is substantiated by the deposition testimony of four witnesses. Furthermore, Folks never denied his knowledge of the allegations and admitted that "it's possible" that he was informed of Diesenhouse's conduct. Folks's unsubstantiated, self-serving testimony that he does not "recall" whether or not he was ever informed of Diesenhouse's wrongdoing does not place this issue in genuine dispute. Because there is no evidence from which a jury could reasonably conclude otherwise, no genuine dispute exists as to whether Folks committed dishonest acts under the fidelity bond.

### B. Manifest Intent.

■ The second element of policy coverage in this case is the meaning of the term "manifest intent" under New York law, and whether the conduct of Folks in relation to the Hampton Vistas loan meets the manifest intent standard as a matter of law. The New York Court of Appeals has not yet had the opportunity to address the manifest intent requirement contained in a fidelity bond. Where there is no decision of a state's highest court directly, this court may look to any sources on which the state's highest court might rely in order to determine what that court may decide. *See L–Tec Elect. Corp. v. Cougar Elect. Org., Inc.,* 198 F.3d 85, 87 (2d Cir.

1999) (*citing Travelers Ins. Co. v. 633 Third Assocs.,* 14 F.3d 114, 119 (2d Cir. 1994)). Pursuant to this principle, we will examine the law of New York's intermediate appellate courts and decisions of this and other circuits to guide us in predicting how the New York Court of Appeals would rule.

First, we examine how a court should discern whether the employee acted with the intent required under a fidelity bond. The majority of courts that have considered the issue, including the New York Supreme Court, Appellate Division, First Department, have attempted to discern the employee's subjective state of mind by reviewing the objective manifestations thereof. In *National Bank of Pakistan v. Basham,* 142 A.D.2d 532, 534, 531 N.Y.S.2d 250, 251 (1st Dep't 1988), *aff'd,* 73 N.Y.2d 1000, 541 N.Y.S.2d 345, 539 N.E.2d 101 (1989), for example, the court considered only external behavior to determine whether the bank employee acted with manifest intent to harm the bank.

■ Other courts have held that the employee's subjective state of mind should be determined by examining the employee's actions, words, and all of the surrounding circumstances. *See Resolution Trust Corp. v. Fidelity and Deposit Co. of Maryland,* 205 F.3d 615, 642–43 (3d Cir. 2000) ("we are cognizant that the employee's actual subjective state of mind virtually is impossible to prove absent resort to circumstantial evidence—objective indicia of intent."); *General Analytics Corp. v. CNA Ins. Co.,* 86 F.3d 51, 54 (4th Cir.1996) ("[B]ecause it is abstract and private, intent is revealed only by its connection with words and conduct."); *Oldenburg,* 34 F.3d at 1539 ("Manifest intent does not require that the employee actively wish for or desire a particular result; ... Manifest intent to cause a loss may be inferred from an employee's reckless conduct and other circumstantial evidence.") (quoting *Federal Deposit Ins. Corp., v. United Pacific Ins.*

Co., 20 F.3d 1070, 1078 (10th Cir.1994) (emphasis omitted)); *Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 859 (7th Cir.1992) (same); *Lustig*, 961 F.2d at 1166 ("To determine intent to cause a loss we do not inquire solely into the subjective motive or purpose of the employee.... The jury should be instructed that in answering the question of intended loss it should consider the range of evidentiary circumstances...."); *Federal Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1035 (6th Cir.1991) (noting that while intent "is thought to refer to a subjective phenomenon that takes place inside people's heads," the law is concerned only with "the external behavior ordinarily thought to manifest internal mental states"). The test is, therefore, essentially subjective with a necessary objective requirement in that an employee's actions can circumstantially establish that the employee acted with the manifest intent to cause the insured a loss. *See* Michael Keeley, *Employee Dishonesty Claims: Discerning The Employee's Manifest Intent*, 30 Tort & Ins. L.J. 915 (1994).

Because the law requires us to look to Folks's conduct to determine if he had the subjective intent to cause the Bank a loss in regard to the Hampton Vistas loan, we must examine what kind of conduct triggers coverage under a fidelity bond. In *Aetna Casualty & Surety Co. v. Kidder, Peabody & Co. Inc.*, 246 A.D.2d 202, 676 N.Y.S.2d 559 (1st Dep't 1998), Aetna sought a declaratory judgment that it was not obligated to indemnify Kidder for the potential liability in several class actions filed after it was discovered in a federal investigation that a Kidder employee had engaged in insider trading. *Id.*, 676 N.Y.S.2d at 560–61. The plaintiffs in the class actions were public shareholders of the companies that were the subject of Kidder's insider trading and alleged that they would not have sold at the prices at which the securities were sold if they had had the same insider information. *Id.* at 561.

Citing law from this and other circuits, *Aetna* articulated a continuum of behavior ranging from behavior manifesting an obvious intent to cause a loss to behavior that does not indicate the employee intended to harm the insured. Where the behavior lies in the middle of the two extremes, intent is often a disputed issue of fact for the jury. The continuum bears repeating here:

> [B]y their clear terms, the fidelity bonds require that the unfaithful employee must intend to cause the employer a loss directly and solely relating to the faithless act, classically describing embezzlement or another type of theft from the employer (*Glusband v. Fittin Cunningham & Lauzon*, 892 F.2d 208 (2nd Cir. 1989)).... An embezzler, at one end of the continuum, necessarily intends to cause the employer the loss, since the employee's gains are directly at the employer's expense (*First National Bank of Louisville v. Lustig [Lustig I ]*, 961 F.2d 1162 (5th Cir.1992)). At the other end of the continuum, not triggering fidelity coverage, is the situation where the employee's dishonesty at the expense of a third-party is intended to benefit the employer, since the employee's gain results from the employer's gain. Under such circumstances, even if the employer suffers a loss, fidelity coverage is not triggered (*Id.; Municipal Securities v. Insurance Co. of N.A.*, 829 F.2d 7 (6th Cir.1987)). Occasionally, intent with regard to the employer's loss presents a factual issue (*First National Bank of Louisville v. Lustig [Lustig 1]*, supra ),....

*Id.*, 676 N.Y.S.2d at 563; *see also Oldenburg*, 34 F.3d at 1540 ("[w]here an individual's conduct falls somewhere between the two extremes of embezzlement and simple poor judgment, intent becomes a question of fact which will generally not be subject to summary judgment.") (internal quotations omitted). Without further analysis, the First Department held that there was no evidence at all that the insider trading

employee's manifest intent was to cause Kidder a loss. *Kidder*, 676 N.Y.S.2d at 563.

In an earlier appellate division case, a bank brought an action against its insurer to recover under its fidelity policy. *See Basham*, 531 N.Y.S.2d at 250. There, an officer of the bank "allowed a bank customer ... to receive immediate credit to its account for five checks ... from drawers whose checks [the officer] had previously had ... occasion to dishonor." *Id.* "When the five checks credited to [the customer] were dishonored as well, [the officer] did not debit [the customer's] account as required by law and proper bank practice." *Id.* The court concluded that the bank officer "intentionally and deliberately chose not to debit [an] account for the dishonored checks, and instead took the funds from an unrelated frozen account ... aware ... that the bank would ultimately bear the responsibility for the misappropriated monies." *Id.*, 531 N.Y.S.2d at 251. The court granted the bank's motion for summary judgment, concluding that the "employee's machinations establish the very circumstances for which fidelity insurance was obtained." *Id. Basham* can be understood as a case where the employee's conduct demonstrates that the employee necessarily intended to cause his employer a loss.

This court has had two opportunities to consider the manifest intent requirement of a fidelity bond and our decisions are in accord with those issued by the First Department of the New York Appellate Division. In *Leucadia*, 864 F.2d at 967–71, an employee authorized loans to persons with obvious credit problems and misrepresented to his superiors the value of the collateral received. We held that manifest intent to harm the employer had not been shown. *Id.* at 972. We later described this case as one where manifest intent was not shown "[b]ecause the employee misguidedly hoped to benefit his employer and received no personal gain from the transaction...." *Glusband*, 892 F.2d at 211.

Thus, *Leucadia* can best be understood as an example of the factual scenario identified in *Aetna* where, as a matter of law, an employee does not manifest an intent to cause a loss.

Subsequently, in *Glusband*, 892 F.2d at 210, we reversed a jury verdict of coverage under an insurance agreement, finding that the trial court had erred by failing to give a requested jury instruction on the meaning of manifest intent. Instead of remanding the case for further proceedings, however, we rendered judgment in favor of the insurer because the evidence was "legally insufficient to support a finding of the requisite manifest intent." *Id.* In so ruling, we stated that:

> The manifest intent provision ... limit[s] protection under this bond to losses due to embezzlement or embezzlement-like acts. The bond thus does not purport to insure against losses caused by reckless or improvident trading, even where the investors have been led to believe that a more conservative investment strategy would be followed.

*Id.* at 212. We further warned that "insurance systems rely upon predictability of risk and that predictability will be seriously diminished or destroyed if courts refuse to abide by limitations on insurance policies." *Id.* In *Glusband* and *Leucadia*, we were concerned with what the employee "hoped," however misguidedly, would be the outcome of his actions. *See id.* at 211. Accordingly, *Glusband* and *Leucadia*, read together, are properly interpreted as defining manifest intent to require that the insured establish that the employee acted with the specific purpose or object to harm the insured.

 Having determined that a court should examine objective indicia of intent and that recovery under a fidelity bond requires that the employee acted with the purpose or desire of causing his or her employer a loss, we now examine the related issue of what evidence circumstantially demonstrates that the employee acted with the specific purpose to cause the insured

harm. Under *Glusband*, evidence of an employee's reckless behavior standing on its own does not satisfy the language of the fidelity bond. *See id.* at 210. Courts from other circuits have permitted consideration of the recklessness of the employee's conduct and agree that although reckness itself is not sufficient to support an inference of intent under a fidelity bond, recklessness in addition to other evidence of intent can support a finding of intent under a fidelity bond. *See Resolution Trust Corp.*, 205 F.3d at 642–43 ("inasmuch as proof of recklessness and/or the employee's knowledge of the likelihood that a loss was to result both serve as manifestations of the employee's specific purpose or design, we hold that a jury may consider those factors, along with any other objective indicia of intent...."); *Peoples Bank & Trust Co. v. The Aetna Casualty & Surety Co.*, 113 F.3d 629, 636 (6th Cir.1997) (recklessness can be evidence of intent, but recklessness itself, without an inference of intent, does not satisfy the language of a fidelity bond); *United Pacific*, 20 F.3d at 1078 (manifest intent can be "inferred from an employee's reckless conduct and other circumstantial evidence"); *Lustig*, 961 F.2d at 1166 ("when an employee obtains fraudulent loans with reckless disregard for a substantial risk of loss to the bank, a jury may infer from his reckless conduct and surrounding circumstances that he intended to cause that loss"); *St. Paul Fire & Marine Ins.*, 942 F.2d at 1036 ("In sum, this clause covers fraud, not bad business judgment, whether that be characterized as 'reckless and imprudent' or just plain poor.") (internal citation omitted). A number of these courts explain that when an employee acts with a reckless disregard for a substantial risk of loss to the insured, intent to cause a loss can be inferred. *United Pacific*, 20 F.3d at 1078; *Heller*, 974 F.2d at 859; *Lustig*, 961 F.2d at 1166; *St. Paul Fire & Marine Ins.*, 942 F.2d at 1035. Accordingly, as the U.S. Court of Appeals for the Third Circuit recently summarized, "proof of an employee's recklessness, or an employee's knowledge that a result was substantially certain to occur from the conduct, are objective indicia—manifestations—of the employee's specific purpose or intent." *Resolution Trust Corp.*, 205 F.3d at 641–42. Therefore, whether a fidelity bond's manifest intent requirement has been satisfied is discerned by considering the relationship between the employee and his or her employer, the employee's knowledge that his conduct may cause the insured a loss, and all other surrounding circumstances bearing upon the employee's purpose. Under *Glusband* and the New York cases, actions that amount to embezzlement or embezzlement-like conduct establish a fidelity bond's manifest intent element as a matter of law. Actions that will possibly result in the benefit of the employer do not, as a matter of law, establish manifest intent. Furthermore, evidence that the employee acted recklessly can be a manifestation of the employee's intent to cause the insured a loss. Finally, manifest intent does not require that the employee actively wish for or desire a particular result, but can exist when a particular result is substantially certain to follow from the employee's conduct. We agree with the United States Court of Appeals for the Third Circuit's very recent observation that this

> construction strikes an appropriate balance because it comports with the drafters' obvious intent to limit the types of employee misconduct covered by this provision but ensures that proof of the employee's recklessness and the substantial likelihood of loss factor into the ultimate inquiry into the employee's subjective state of mind.

*Resolution Trust Corp.*, 205 F.3d at 642.

With this somewhat foggy background as our guidance, we conclude that the New York Court of Appeals would decide that the evidence here is sufficient to support the district court's finding of manifest intent to cause the Bank a loss as

a matter of law. Folks's failure to disclose to the Bank that the general contractor of Hampton Vistas was stealing from the project was imprudent and reckless and a probable breach of his fiduciary duty as trustee of the Bank and as a member of the Mortgage and Real Estate Committee. Folks was vested with the responsibility of overseeing the Bank's investment of funds in real estate joint ventures, yet he permitted it to continue to extend credit to the Hampton Vistas venture in an amount exceeding its maximum funding exposure by millions of dollars. We conclude that Folks's conduct in remaining silent when the Bank chose to lend $8 million more to Hampton Vistas was substantially certain to cause the Bank a loss. Moreover, Folks's failure to disclose that Diesenhouse inflated prices and accepted kickbacks certainly harmed the Bank in its capacity as partner in the joint venture, because these actions would diminish the profits or increase the losses for the joint venture.

In addition to evidence that Folks's actions placed the Bank at substantial financial risk, the district court also had before it specific evidence of Folks's intent to cause the Bank a loss. By his own testimony, Folks reveals that he took the actions described above despite his personal belief that the Bank would suffer a loss if it continued to fund the Hampton Vistas project. Folks testified in his deposition that if he were a trustee of the Bank and had been told of Diesenhouse's actions, he would have voted immediately to cease further funding to the Hampton Vistas project. Folks also took steps to protect his own interests in his other projects, but left the Bank exposed to further harm. National Union insists that the factual record is unclear as to whether Folks took any steps to protect his investments in light of the allegations concerning Diesenhouse, but it relies on vague denials and memory lapses, which do not create genuine issues of material fact. Finally, the fact that Folks was Diesenhouse's partner on two other construction projects shows that Folks was attempting to benefit himself by concealing Diesenhouse's misdeeds. This evidence demonstrates that Folks's intent toward the Bank was ignoble, rather than just improvident and reckless. Folks did more than risk a loss—he acted with personal certainty that loss would result.

This case presents the factual scenario that falls at the end of the *Aetna* continuum where the employee necessarily intends to cause the employer a loss because Folks's gains were made directly at the expense of the Bank. It therefore can be distinguished from *Glusband* because there is absolutely no evidence that the Bank stood to benefit from Folks's actions. In *Glusband,* the actions of the employee, no matter how unlikely they were to succeed in making money, by their very nature could only result in making money for the employee if the insured did so as well. Both benefited or lost together. Here, in contrast, there is no evidence that Folks's actions would benefit the Bank. When a bank employee, entrusted with overseeing a bank's real estate loans, causes the bank to issue a loan while concealing the fact that the manager of the project receiving the loan is stealing from the venture, it is the bank which stands to lose. Add to the foregoing the fact that the bank employee is in partnership with the thief on other projects, unbeknownst to the bank, and one can only conclude that the employee seeks to benefit himself or herself through the dishonest act. Moreover, Folks suggested no creditable alternative motive for failing to inform the bank, claiming only that he does not recall being told of Diesenhouse's misdeeds. Therefore, the evidence submitted here is sufficient to establish as a matter of law that Folks manifested an intent to cause the Bank a loss.

National Union's attempt to create a genuine dispute as to the manifest intent element of coverage is unavailing. It argues on appeal that, even assuming that DiPietro and DeChiaro told Folks that Diesenhouse was stealing, Folks's testimo-

ny indicates that he did not take the allegations seriously and for this reason decided not to tell the Bank. The record demonstrates, however, that Folks took actions to protect his personal interests in the projects in which Diesenhouse was involved. Thus, Folks's contention that he had no reason to take the allegations seriously is belied by the fact that he took them very seriously when it came to protecting his own interests.

We are persuaded that the FDIC has demonstrated that it is entitled to summary judgment on the manifest intent element of coverage under a fidelity bond.

### C. Direct Cause.

█ The third issue we must consider is whether Folks's fraudulent nondisclosure directly caused the Bank's loss. The bond provides coverage for "[l]oss *resulting directly* from dishonest or fraudulent acts . . . ." Furthermore, the bond excludes "indirect or consequential loss of any nature." Again, the New York Court of Appeals has not construed a fidelity bond's causation requirement. In *Kidder*, the Appellate Division held that the putative losses to Kidder that arose in part due to settlements with the third parties were not directly caused by the employee's dishonest actions. *See* 676 N.Y.S.2d at 564. The court explained that Kidder's replacement of funds embezzled by the employee from a customer's account maintained by a separate institution was not a direct loss to Kidder. *See id.* ("[T]he employee's dishonesty only caused pricing irregularities in the stock, which, themselves, caused losses to the customers, which then led to litigation concluding in settlement.").

The loss in the present case, however, is the Bank's issuance of a loan and not the replacement of funds to a third party who has sued the Bank because of Folks's actions. Pertaining to loans, the United States Court of Appeals for the Fifth Circuit has held that:

A loss is directly caused by the dishonest or fraudulent act within the meaning of the Bond where the bank can demonstrate that it would not have made the loan in the absence of the fraud.

*Lustig,* 961 F.2d at 1167. Accordingly, we predict that the New York Court of Appeals would agree with the district court that the evidence demonstrates that Folks's nondisclosure was the direct cause of the Bank's loss on the Hampton Vistas loan.

The FDIC was entitled to recover under the bond because the FDIC showed that the Bank would not have issued its second loan if it had known of Diesenhouse's wrongdoing. Bank trustees submitted consistent affidavits that had they been informed that Diesenhouse was engaged in misconduct or criminal behavior, the Board of Trustees would have ceased all further funding to Hampton Vistas. They swore that they would have "immediately pursued a full investigation, the removal of Mr. Diesenhouse from the Hampton Vistas project, and cessation of all further funding to the Hampton Vistas development to the extent permissible." National Union argues that it was entitled to cross examine the trustees, who are defendants in another lawsuit that the FDIC brought to recover the Bank's losses and in which the FDIC accuses the trustees of mismanagement. This argument founders on Folks's admission that he himself would have urged the trustees to cut off funding if he had known of the accusations against Diesenhouse. Thus, had Folks disclosed to the Bank the allegations regarding improper and illegal acts by Diesenhouse, the Bank never would have made the additional loans and would not have suffered the loss. It is inconsequential that the real estate market's downturn may have contributed to the Bank's loss. The fact remains that with the information on hand, the Bank would not have made the loan in the first instance.

We have carefully considered National Union's additional arguments and find that they are unavailing. Because we find that

there was sufficient evidence of dishonest acts, manifest intent, and causation to establish these elements as a matter of law, we hold that summary judgment was properly granted to the FDIC.

## CONCLUSION

Based on the foregoing, we affirm the district court's entry of summary judgment in favor of the FDIC.