TRI CITY NATIONAL BANK, Plaintiff-Appellant,

v.

FEDERAL INSURANCE COMPANY, Defendant-
Respondent.

Court of Appeals

*No. 03–0305. Submitted on briefs October 7, 2003.—
Decided December 9, 2003.*

2004 WI App 12

(Also reported in 674 N.W.2d 617.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Dennis L. Fisher, Steven F. Stanaszak,* and *Joseph M. Engl* of *Meissner, Tierney, Fisher & Nichols, S.C.,* of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Donald L. Mrozek, pro hac vice, Stephen R. Swofford, pro hac vice,* and *Randal N. Arnold* of *Hinshaw & Culbertson,* of Milwaukee.

A nonparty brief was filed by *Thomas N. Klug* of *Borgelt, Powell, Peterson & Frauen, S.C.,* of Milwaukee, on behalf of the Surety Association of America.

A nonparty brief was filed by *John E. Knight* and *Kirsten E. Spira* of *Boardman, Suhr, Curry & Field, LLP,* of Madison, on behalf of the Wisconsin Bankers Association.

Before Fine, Schudson and Curley, JJ.

¶ 1. CURLEY, J. Tri City National Bank (Tri City) appeals from the trial court judgment and order dismissing its suit against Federal Insurance Company (Federal). Tri City sued Federal, seeking reimbursement under a fidelity bond issued to Tri City by Federal, for monies paid to two mortgage companies in the form of settlements as the result of the fraudulent acts of two Tri City employees. We determine that because the standard fidelity bond issued to Tri City contained language limiting losses to those "resulting directly" from an employee's dishonest or fraudulent acts and the fraudulent acts here did not result in any direct losses to the bank, no coverage existed for Tri City's claimed losses. Consequently, we affirm the trial court.[1]

---

[1] Besides the excellent briefs of the parties, amicus curiae briefs were filed on behalf of the Wisconsin Bankers Association and the Surety Association of America. All of these briefs were invaluable in assisting the court in refining the questions and determining the answers.

## I. BACKGROUND.

¶ 2. Tri City is a national bank with various branches in the greater- Milwaukee area. As a national bank, it is required to have "adequate fidelity coverage" pursuant to federal law. 12 C.F.R. § 7.2013 (2003).[2] To comply, it purchased a Financial Institution Bond— Standard Form No. 24 revised to January 1986—from Federal. During the term of the bond, two employees of a Tri City branch bank participated in a scheme with an outsider to fraudulently obtain mortgage loans for insufficiently funded borrowers who did not otherwise qualify for the loans. The scheme operated by having the outsider recruit a buyer for property owned by him or one of his businesses and having the buyer apply for a mortgage loan with one of two mortgage companies. The conspiring bank employees would then send a phony verification to the mortgage company indicating that the buyer had an account at Tri City with sufficient sums to cover the down payment. Once the mortgage was approved, one of the two conspiring bank employees would issue bank cashier's checks for the recruited borrower to use at the closing, despite the lack of sufficient funds in a Tri City account, giving the false impression that the borrower was using personal funds for the down payment. Once the closing took place, the outside co-conspirator took the loan proceeds to the bank, paid for the cashiers check, and paid off the bank employees. At least seventy-four loans were procured in this fashion. Neither the mortgage lenders nor other bank personnel were aware of the scheme. It was

---

[2] 12 C.F.R. § 7.2013(a) provides, in relevant part:" Adequate coverage. All officers and employees of a national bank must have adequate fidelity coverage."

only discovered after multiple defaults in the loans brought the scheme to light.[3]

¶ 3. Following the detection of the fraudulent scheme, the mortgage companies sued Tri City to recover their losses. In their pleadings, the lenders alleged that the actions of Tri City's employees were material misrepresentations made by agents of Tri City, and consequently, the bank was responsible. They also claimed that the loan defaults, and thus the companies' losses, were a "direct and proximate result" of the false representations made by Tri City's employees.

¶ 4. After receiving notice of the suit, Tri City promptly notified Federal and requested confirmation that the bond covered the bank for either judgments or settlements paid to the mortgage companies resulting from the fraud. Federal denied coverage on the ground that the bond's language only covered losses "resulting directly from dishonest or fraudulent acts" of Tri City employees. Federal asserted that the losses were not the direct result of the dishonest and fraudulent acts of Tri City's employees.

¶ 5. Tri City proceeded to settle the actions brought by the mortgage companies for $4,250,000. Afterwards, Tri City demanded reimbursement from Federal for the settlement amounts, but Federal continued to deny coverage. As a result, Tri City commenced a declaratory judgment action against Federal alleging that, by virtue of the fidelity bond, Federal was obligated to indemnify Tri City for the settlement amounts. Federal moved to dismiss for failure to state a claim upon which relief can be granted, pursuant to

---

[3] The three co-conspirators were prosecuted by the U.S. Attorney and convicted.

Wis. Stat. § 802.06(2)6 (2001–02). After briefing and oral argument, the trial court entered an extensive memorandum order granting the motion to dismiss. The trial court reasoned that while Tri City experienced losses because of the bank employees' dishonest and criminal actions, those actions—the basis of the claims asserted by the mortgage companies—did not "give rise to a [l]oss directly resulting from dishonest or fraudulent acts" of the employees.

## II. ANALYSIS.

¶ 6. When an appellate court reviews a motion to dismiss for failure to state a claim, its review is *de novo*. *Kohlbeck v. Reliance Constr. Co.*, 2002 WI App 142, ¶ 9, 256 Wis. 2d 235, 647 N.W.2d 277. "In determining whether a party has stated a claim, we are concerned only with the legal sufficiency of the complaint." *Id.* We accept all alleged facts and reasonable inferences as true, but draw all legal conclusions independently. *Town of Eagle v. Christensen*, 191 Wis. 2d 301, 311–12, 529 N.W.2d 245 (Ct. App. 1995).

¶ 7. The resolution of this matter also requires us to interpret the fidelity bond Federal issued to Tri City. Fidelity bonds insure an employer against employee infidelity. *See* LEE R. RUSS & THOMAS F. SEGALLA, 11 COUCH ON INSURANCE § 160:1 (3d ed. 1998). Thus, such bonds are a form of insurance. When insuring a bank, this type of policy is often referred to as a "Bankers' Blanket Bond," *see id.*, § 167:52, with "blanket" meaning it covers all employees, *see* LEE R. RUSS & THOMAS F. SEGALLA, 7 COUCH ON INSURANCE § 100:1 (3d ed. 1998). The fidelity bond purchased here is an example of a "Bankers' Blanket Bond."

■

¶ 8. When reviewing an insurance policy, "[a] construction of an insurance policy that gives reasonable meaning to every provision of the policy is preferable to one leaving part of the language useless or meaningless." *Frost v. Whitbeck*, 2002 WI 129, ¶ 21, 257 Wis. 2d 80, 654 N.W.2d 225. "[P]olicies should be given a reasonable interpretation and not one [that] leads to absurd results." *Nichols v. American Employers Ins. Co.*, 140 Wis. 2d 743, 751, 412 N.W.2d 547 (Ct. App. 1987). Additionally,

> [t]he intended role of the coverage should be kept in mind when construing policy language; the nature and purpose of the policy as a whole have an obvious bearing on the insured's reasonable expectations as to the scope of coverage and on whether the risk involved was, or should have been, contemplated by the insurer in computing its rates.

*Shelley v. Moir*, 138 Wis. 2d 218, 222, 405 N.W.2d 737 (Ct. App. 1987). Finally, "a policy may not be construed to bind the insurer to a risk which it did not contemplate and for which it received no premium." *Id.*

■

¶ 9. Initially, the parties disagree as to the rules of construction that apply to what Tri City asserts is ambiguous language in the contract. Tri City asserts that all ambiguous language must be strictly construed against the drafter. Federal disagrees. It contends that there is no ambiguous language in the bond; and, even if there were, because of the unique history of the bond language, the general rule of construing ambiguous language against the drafter is not followed. We agree with Federal that the general rules of construction do not apply.

¶ 10. In *Aetna Casualty & Surety Co. v. Kidder, Peabody & Co.*, 676 N.Y.S.2d 559 (App. Div. 1998), *appeal denied*, 93 N.Y.2d 805, 711 N.E.2d 643 (1999), a New York appellate court delved into the history of fidelity bonds. The court concluded that the earliest versions of the standard-form bonds were drafted over thirty years ago by a joint committee of the stock exchange and the insurance communities whose mission was "to refine the exact meaning of [the term] employee dishonesty" in order to stem the tide of judicial decisions that broadened the policies beyond what was contemplated by the parties while ensuring that employers would have coverage for the acts of employee-thieves. *Id.* at 565.

> Memoranda generated by the insurance industry and stock exchanges in connection with the industry-wide drafting of the standard blanket fidelity policies over the last 30 years, demonstrating the significant discussion of standard coverage provisions by organized groups of underwriters as well as insureds, also reflect these meanings. The standard-form bonds that provided the basic language of the present bonds were drafted during the 1970's. At that time, a joint committee of the stock exchange and insurance-industry communities reviewed fidelity bonding concerns in light of claims by underwriters that the increasing loss ratio of the bonds was reducing the attractiveness of fidelity coverage. The expressed intent of the underwriters was to refine the exact meaning of employee dishonesty under the bonds as a means of addressing judicial decisions expanding coverage beyond that originally contemplated, while ensuring that employers who had the misfortune of hiring potential embezzlers (although not necessarily limited·to embezzlement) could purchase such protection.

*Id.* (citation omitted).

¶ 11. As a result, as explained in Eric Mills Holmes & Mark S. Rhodes, 1 Holmes's Appleman on Insurance, § 4.23 (2d ed. 1996), the normal rules of construction of insurance policies do not apply: "The Bankers Blanket Bond was created by the banking industry in conjunction with insurers providing surety coverage. Accordingly, the rules of construction strictly against the insurer where ambiguities are found are not applicable since the terms of the standard bond were negotiated between parties with relatively equal bargaining power." This has been recognized in *State Bank of Viroqua v. Capitol Indemnity Corp.*, 61 Wis. 2d 699, 702 n.1, 214 N.W.2d 42 (1974) ("These bonds are not the usual contracts of adhesion and the familiar rule of interpreting a contract strictly against the insurer and liberally in favor of the insured should not apply."); *Sharp v. Federal Savings and Loan Insurance Corp.*, 858 F.2d 1042, 1046 (5th Cir. 1988) (regarding Standard Form No. 22, the principle that insurance contracts are to be construed against the underwriter does not apply when "the contract was in fact a joint effort of both insurers and the insureds," that is, of both the banking and surety industries); and *Calcasieu-Marine National Bank of Lake Charles v. American Employers' Insurance Co.*, 533 F.2d 290, 295 n.6 (5th Cir. 1976) (noting that "the banker's blanket bond being construed was drafted by a joint effort of the American Bankers' Association and the American Surety Association[,]" and accordingly, the rationale that "it would be unjust to construe an ambiguous provision in favor of the party that drafted it[, the insurer,] may not be applicable"). Thus, should there be any ambiguity, the wording of fidelity bonds is not construed strictly against the drafter because the justification behind the rule— unequal bargaining power—has been eliminated.

¶ 12. Tri City asserts that its fidelity bond with Federal covers its losses paid to the mortgage companies for the fraudulent acts of its employees because the losses "resulted directly from" the employees' dishonesty. Tri City contends: (1) a reasonable banker would expect coverage because the bond language "loss resulting directly from" is ambiguous; (2) "direct" has been defined as meaning "proximate cause," and the employee acts here were the "proximate cause" of the losses; (3) case law interpreting the phrase supports its position; (4) WIS. STAT. § 224.06 (2001–02) requires banks to obtain coverage for employee fraud or dishonesty, and thus, statutory authority supports its position that coverage exists under the bond; (5) public policy considerations are advanced by extending coverage for such losses; and finally, (6) whether the losses "result[ed] directly" from its employees' falsifications is a jury question, making a dismissal of the action inappropriate. For the reasons that follow, we disagree with all of Tri City's arguments.

¶ 13. However, before discussing Tri City's arguments, we pause to explain the differences between fidelity bonds and liability insurance policies. As noted, a fidelity bond is a form of insurance. *See First Nat'l Bank of Crandon v. United States Fid. & Guar. Co.*, 150 Wis. 601, 607, 137 N.W. 742 (1912). But, a fidelity bond is not a liability insurance policy. A fidelity bond differs from a liability policy of insurance because of the risk being insured. *Aetna*, 676 N.Y.S.2d at 565; *see Foster v. National Union Fire Ins. Co.*, 902 F.2d 1316, 1318 (8th Cir. 1990) ("A fidelity bond is not ordinarily liability insurance which covers third parties."). A fidelity bond is an indemnity contract that "guarantee[s] reimbursement for losses sustained by the insured resulting from

the dishonesty of the insured's employees." *Continental Corp. v. Aetna Cas. & Sur. Co.*, 892 F.2d 540, 543 (7th Cir. 1989). Noting the distinction between fidelity bonds and liability insurance policies, the court opined: "Insurance covers the liability of the insureds to a third-party, while fidelity bonding covers the loss of property owned by the insureds or held by the insureds, as a consequence of employee dishonesty." *Aetna*, 676 N.Y.S.2d at 565.

A. *The fidelity bond's wording is not ambiguous and a reasonable banker reading the bond would not expect coverage.*

¶ 14. Tri City contends that the bond is ambiguous, and in construing the wording of the bond under the usual rules of construction for an insurance policy, a reasonable banker would expect coverage for the acts that occurred here.

¶ 15. The fidelity bond at issue is an SAA Standard Form No. 24, revised to January 1986. The pertinent language states that the bond covers:

(A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a) to cause the Insured to sustain such loss; and

(b) to obtain financial benefit for the Employee or another person or entity.

¶ 16. Tri City observes that nowhere in the bond are the words "loss," "resulting," or "directly" defined. It submits that the ordinary dictionary meaning of those

words would encompass the losses resulting from their employees' fraudulent acts. It looks to definitions found in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1338 (Merriam Webster, Inc. 1993), where a common meaning for the noun "loss" is: "the amount of an insured's financial detriment due to the occurrence of a stipulated contingent event (as death, injury, destruction or damage) in such a manner as to charge the insurer with a liability under the terms of the policy[.]" Also, the same dictionary states that "result" is a verb meaning "to proceed, spring, or arise as a consequence, effect, or conclusion[,]" *id.* at 1937, and that the adverb "directly" means, among other things, "straight on along a definite course of action without deflection" or "in close relational proximity[,]" *id.* at 641. Consequently, given the definitions, Tri City concludes that the language was ambiguous because the "reasonable expectation of a banker considering the ordinary meaning of that language would be that if an employee's dishonest conduct proceeds by a straightforward chain of events to some form of financial loss to the bank, there will be coverage." We are not persuaded.

██ ██

¶ 17. In interpreting a contract, this court must look for the intent of the parties in the plain language of the contract. *Dieter v. Chrysler Corp.*, 2000 WI 45, ¶ 15, 234 Wis. 2d 670, 610 N.W.2d 832; *see also Shelley*, 138 Wis. 2d at 222 (noting that "[i]n interpreting and construing an insurance contract; the object is to ascertain the true intention of the parties[, and] objective rather than subjective intent is the test"). Ambiguity exists in a contract if the contractual language is "reasonably and fairly susceptible to more than one construction." *Dieter*, 234 Wis. 2d 670, ¶ 15 (citation omitted). As noted, should there be any ambiguous

language, the ordinary rule of construing any ambiguity against the drafter does not apply here.

¶ 18. Our reading of the bond satisfies us that the bond is not ambiguous. First, the bond clearly restricts indemnification to those losses that occur as a direct result of an employee's dishonest acts.[4] This language is not susceptible to more than one meaning. Here, the loss was not direct. It was only after the mortgage defaults occurred, some three years after the employees' deceitful actions, that Tri City's liability to the mortgage companies came into being. The losses did not "result[ ] directly from dishonest or fraudulent acts committed by employe[es,]" as the losses did not exist until the unsuitable mortgage holders defaulted on their loans and the mortgage companies sued Tri City.

¶ 19. Further, given the history of fidelity bonds and the reasons behind the revisions, a reasonable banker would not expect coverage for these losses. The Bankers' Blanket Bond was revised in 1980, and again in 1986, and is known as Financial Institution Bond-–Standard Form 24. Karen Wildau, *Evolving Law of Third-Party Claims Under Fidelity Bonds: When Is Third Party Recovery Allowed?*, 25 TORT & INS. L.J. 92, 92–93 (1989). The previous, pre-1980 version of the bond insured a bank for "[l]oss through any dishonest or fraudulent act[.]" *Id.* at 93 (citation omitted). The 1980 revision further restricted the bond by insuring a bank only for "[l]oss resulting directly from dishonest or fraudulent acts" of its employees. *Id.* at 94 (citation omitted). As noted above, "[t]he expressed intent of the

---

[4] There are other restrictions as well, but they are not at issue here.

underwriters was to refine the exact meaning of employee dishonesty under the bonds as a means of addressing judicial decisions expanding coverage beyond that originally contemplated, while ensuring that employers . . . could purchase . . . protection" against dishonest employees.[5] *Aetna*, 676 N.Y.S.2d at 565. Consequently, given the extensive history of fidelity bonds in the banking business, a reasonable banker would be charged with the knowledge of the fidelity bond restrictions and not expect coverage for indirect losses. In determining coverage, one looks to "what a reasonable person *in the position of the insured* would have understood the words of the policy to mean." *Badger Mut. Ins. Co. v. Schmitz*, 2002 WI 98, ¶ 51, 255 Wis. 2d 61, 647 N.W.2d 223 (citation omitted) (emphasis added).

¶ 20. Additionally, in *Aetna,* a case that received considerable media attention, the court considered whether fidelity bonds covered liabilities to third parties and ultimately concluded:

> Nothing in the history of these particular bonds, which comports with an historical understanding of what fidelity coverage is, indicates that the employee infidelity being covered as a risk could reach the employee's dishonesty toward third parties, absent an intent to cause a loss to the employer.

---

[5] Other changes were made during this revision. The "Ownership" section was added, as was an exclusion for "indirect or consequential loss of any nature." *See* Karen Wildau, *Evolving Law of Third-Party Claims Under Fidelity Bonds: When Is Third Party Recovery Allowed?*, 25 TORT & INS. L.J. 92, 94, 117–18 (1989). Arguably, the losses experienced by Tri City may also fall within this new exclusion.

676 N.Y.S.2d at 565. Thus, the history of fidelity bonds supports the interpretation, advocated by Federal, that the losses experienced here were outside the employee dishonesty coverage.

> *B. Tri City wrongly proposes that the word "direct" found in the bond is synonymous with "proximately" and "proximate cause."*

¶ 21.　Tri City next submits that because Wisconsin and foreign case law have interpreted the word "direct" to mean "proximately" and "proximate cause," the wording of the policy can be read with these synonyms, transforming the policy language to provide coverage for losses proximately caused by the employees' dishonesty. We disagree.

¶ 22.　As Federal advocates in its brief, "proximate cause cases involving casualty policies are not really relevant." We agree. Casualty policies are written with a different intent and they rarely contain the limiting language found in fidelity bonds. "As a general rule, 'casualty insurance' covers accidental injury both to person and to property and has, in fact, been defined as insurance against loss through accidents or casualties resulting in bodily injury or death." COUCH ON INSURANCE 3D § 1:28. As to the cases Tri City cites in support of this proposition, Federal advances that in regard to seven of the eight cases:[6]

---

[6] The seven cases are: *Resolution Trust Corp. v. Fidelity and Deposit Co. of Maryland,* 205 F.3d 615 (3d Cir. 2000); *Jefferson Bank v. Progressive Casualty Insurance Co.,* 965 F.2d 1274 (3d Cir. 1992); *Bidwell & Co., National Union Fire Insurance Co.,* No. CV-00-89-HU, 2001 WL 204843 (D. Or. Jan. 18, 2001); *Omnisource Corp. v. CAN/Transcontinental Insur-*

[t]he . . . decisions focused on causation, but only in the context of a direct loss (that is, losses of the insured's own property, or property for which it was legally responsible) . . . . In each case, the insured sustained a direct loss of its property or property for which it was legally responsible, and the proximate cause issue was whether some intervening event broke the causal connection between the dishonest conduct of an employee and the insured's loss.

Again, our review of the cases supports Federal's position. Finally, in the eighth case, *First National Bank of Fulda, Minnesota v. Bancinsure, Inc.*, No. Civ. 00–2002DDA/FLN, 2001 WL 1663872 (D. Minn. Dec. 21, 2001), we note that the support for Tri City's position is dicta and unpersuasive.

C. *The majority of courts that have actually interpreted the bond's language have done so in a manner consistent with the trial court's determination.*

¶ 23. Tri City cites numerous cases claiming they support its position. Our research reveals that the majority of courts actually interpreting the phrase "loss resulting directly from dishonest or fraudulent acts" of employees have concluded that the phrase is not ambiguous and have interpreted the bond language narrowly.

¶ 24. *Aetna* has a similar fact situation to that found here. There, a securities brokerage firm found

---

ance Co.*, 949 F. Supp. 681 (N.D. Ind. 1996); *Mid-America Bank of Chaska v. American Casualty Co. of Reading, Pennsylvania*, 745 F. Supp. 1480 (D. Minn. 1990); *Federal Deposit Insurance Corp. v. Reliance Insurance Corp.*, 716 F. Supp. 1001 (E.D. Ky. 1989); and *Hanson PLC v. National Union Fire Insurance Co.*, 794 P.2d 66 (Wash. Ct. App. 1990).

itself liable to stockholders of various companies for millions of dollars as a result of its employees' illegal insider trading. The firm was covered by fidelity bonds that included "direct loss" language similar to·that of the bond issued by Federal in this case. The court found that the fidelity bond did not cover third-party claims such as those sought by the stockholders.[7] In finding no coverage existed, the court essentially opined that to decide otherwise would effectively read the word "direct" out of the bond. *Aetna,* 676 N.Y.S.2d at 564. The court reasoned:

> Finally, in this regard, the putative loss to [the brokerage firm] arises in part from a settlement with third parties, but the settlement was not the direct result of the employee's dishonest conduct; the employee's dishonesty only caused pricing irregularities in the stock, which, themselves, caused losses to the customers, which then led to litigation concluding in settlement. In this sense, the settlement would not constitute a covered loss.

*Id.* (citation omitted). The same reasoning applies here. Tri City's losses—the settlements with the mortgage companies—are not the direct result of the employees' dishonesty; the employees were dishonest by permitting financially inappropriate people to obtain mort-

---

[7] It did note, however, that "[t]he bonds' other coverage terms compensate the insureds for third-party losses in connection with the insureds' loss of their property, such as securities and records or precious metals, but those are distinct provisions not triggering fidelity coverage under provision [A], and the insureds' claims do not arise under those other provisions." *Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co.,* 676 N.Y.S.2d 559, 564 (App. Div. 1998) (citations omitted), *appeal denied,* 93 N.Y.2d 805, 711 N.E.2d 643 (1999). The provision in question here is similar to that of provision [A] of the bond in *Aetna.*

gages from other entities, not the employer bank. Thus, the bank initially lost nothing as a result of their dishonesty. It was only after the unsuitable mortgagees defaulted on their loans and the mortgage companies sued Tri City that "losses" resulted.[8]

¶ 25. In *Vons Cos. v. Federal Insurance Co.*, 212 F.3d 489 (9th Cir. 2000), the Court of Appeals for the Ninth Circuit, interpreting California law, came to the identical conclusion. There, an employee of Vons was part of a fraudulent scheme in which he received secret payments from another company and confirmed fictitious transactions to the funding sources of that company. The funding sources eventually sued the company, and joined Vons as a defendant because it employed the dishonest employee, claiming around $300 million in damages. The employer settled the claims for $10 million, and then requested reimbursement under its fidelity bond. The insurance company refused. In agreeing with the insurance company, the court said: "Under the insuring clauses, [the employer] is covered only for direct losses to [it] caused by its employees' dishonesty, not for vicarious liability for losses suffered by others arising from its employees' tortious conduct." *Id.* at 491. Other cases coming to the same conclusion are: *City of Burlington v. Western Surety Co.*, 599 N.W.2d 469 (Iowa 1999); *Central National Insurance Co. of Omaha v. Insurance Co. of North America*, 522 N.W.2d 39 (Iowa 1994); and *Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*, 816 A.2d 1068 (N.J. Super. Ct. App. Div. 2003). Indeed, the only case on point that has come to what appears to be the opposite

---

[8] Indeed, the pleadings establish that the scheming employees had no "manifest intent . . . to cause the Insured to sustain" any loss at all, as would have been required for coverage under Section (A) of the bond.

conclusion is the case much-touted by Tri City, *First American State Bank v. Continental Insurance Co.*, 897 F.2d 319 (8th Cir. 1990). We do not, however, find this case instructive because the federal court's prediction of how the Iowa Supreme Court would interpret the phrase turned out to be wrong,[9] and the facts are distinguishable.

¶ 26. *First American* concerned the dishonest acts of a bank president who engaged in an elaborate scheme with two bank customers.[10] The bank president convinced two customers to take out loans at the bank and then give him the loan proceeds in exchange for his promissory notes. *Id.* at 322. He proceeded to lose most of the money in bad investments and, when the customers demanded their money in order to pay off their bank loans, he was unable to repay the notes. *Id.* The customers sued the bank and the bank president. Ultimately, the bank settled with the customers. *Id.* at 323.

---

[9] We note Tri City cites numerous cases for support of its argument that fidelity bonds can cover losses of third parties. We agree that there are instances when third party losses may be covered under fidelity bonds, but that is not the issue here. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 629 (5th Cir. 1998) ("Although employee dishonesty policies may cover the loss of third-party property in the possession of the insured, these policies do not serve as liability insurance to protect employers against tortious acts committed against third-parties by their employees.") (citation omitted). The issue presented in this case is whether those third-party losses are losses that "result[ed] directly from dishonest or fraudulent acts committed by an Employee." We have concluded they are not.

[10] The employee held several positions during the course of the scheme, including chief agricultural loan officer, vice president, executive vice president, and president. For clarity, we will refer to him only as the "bank president."

¶ 27. In affirming the federal district judge's decision that the monies paid out in settlement of the bank loans were covered losses, the court looked to an Iowa law mandating a bond for state-chartered banks' officers and employees, and concluded the bond in question was a statutory bond. *Id.* at 325. It then extrapolated from other Iowa case law not on point, and found that the settlements were covered losses because they were a direct result of the bank president's dishonest and fraudulent acts.

> The funds expended to settle such liability directly resulted from [the bank president's] acts as a matter of law and therefore constituted covered losses under the Bond.
>
> First Bank incurred potential third party liability as a result of [the bank president's] conduct. Therefore, it also incurred a loss when it expended funds to effect settlement, hereinafter referred to as settlement costs.
>
> . . . .
>
> A settlement precipitated by claims of fraud or dishonesty and paid to a third party by the insured is a covered loss.

*Id.* at 326. The court also cited a case interpreting a bond with pre-1980 language.

¶ 28. At the time, no case interpreting the "directly resulting" language had been decided by the Iowa Supreme Court. However, since that time, the Iowa Supreme Court has rejected the interpretation of the phrase "directly resulting from one or more fraudulent or dishonest acts committed by an employee" embraced by *First American*. In *Central National Ins.*, the Iowa Supreme Court stated that a bankers' blanket bond "neither insures against an insured's liability to third

parties nor indemnifies an insured for payments the insured makes to third parties." 522 N.W.2d at 44. Thus, the federal court wrongly predicted how the Iowa Supreme Court would decide this issue.

¶ 29. Further, the facts in *First American* are unlike those here. In *First American*, the customers were not the only victims of the fraudulent scheme; the bank was a victim as well—loan proceeds were lost when the president fraudulently obtained the bank's money by using bank customers as a conduit. Thus, while the logic of the case is flawed, the final result may be correct as the bank did appear to suffer some direct loss as a result of the bank president's dishonest acts. Unlike the circumstances in *First American*, Tri City did not lose any money directly from the scheme. Consequently, we do not find *First American* instructive.

### D. Wisconsin Stat. § 224.06 does not apply.

¶ 30. Tri City next contends that because WIS. STAT. § 224.06 requires fidelity bonds for bank employees, Federal is statutorily obligated to cover the losses incurred by Tri City. We disagree. Section 224.06 reads, in pertinent part:

**Fidelity bonds for bank officers and employees.**
(1) As a condition precedent to qualification or entry upon the discharge of his or her duties, every person appointed or elected to any position requiring the receipt, payment or custody of money or other personal property owned by a bank or in its custody or control as collateral or otherwise, shall give a bond from an insurer qualified under s. 610.11 to do business in this state, in such adequate sum as the directors shall require and approve. In lieu of individual bonds the division may accept a schedule or blanket bond which

covers all of the officers and employees of any bank whose duties include the receipt, payment or custody of money or other personal property for or on behalf of the bank. All such bonds shall be in the form prescribed by the division.

. . . .

(3) Such bond shall be sufficient in amount to protect the bank from loss by reason of acts of fraud or dishonesty including forgery, theft, embezzlement, wrongful abstraction or misapplication on the part of the person, directly or through connivance with others. At any time the division may require additional bond or security, when in the division's opinion, the bonds then executed and approved are insufficient.

¶ 31. As Tri City concedes, it is not a state-chartered bank; it is a federally-chartered bank. We will leave for another day the interplay between state-chartered banks, the statute mandating insurance coverage, and fidelity bonds. Regardless of whether the statute covers federally-chartered banks, the statute cannot expand the bond's coverage.

*E. Public policy is not advanced by expanding coverage.*

¶ 32. Tri City argues that the fidelity bond should be read to cover its losses because to do so furthers public policy. It submits:

Tri City and other banks in Wisconsin will be without protection from one of the most devastating and undetectable risks – that of losses caused by conspiratorial criminal conduct of employees leading directly to vicarious liability for the bank in a setting which is not only difficult to discover, but difficult to defend.

¶ 33. While we agree that broad coverage would be helpful to the banks, we are satisfied that it is better public policy to strive for uniform interpretation of insurance policies, particularly of those policies issued nationwide. Our interpretation is consistent with that of most courts, with the possible exception of *First American*, that have interpreted the phrase.

 *F. Tri City contends that whether the losses are covered is a jury question.*

¶ 34. Finally, Tri City suggests that the trial court erred in granting the motion because whether the losses are covered is a jury question. We have determined as a matter of law that the fidelity bond does not provide coverage for the acts that both parties agree occurred. In granting the motion to dismiss, the trial court was, in essence, entering judgment on the pleadings. When a court grants judgment on the pleadings, it does so because there is no genuine issue of material fact to be resolved and one party is entitled to judgment as a matter of law. *Schuster v. Altenberg*, 144 Wis. 2d 223, 228, 424 N.W.2d 159 (1988). Juries resolve factual disputes. No jury is needed here because no factual dispute exists. Accordingly, we affirm.

 *By the Court.*—Order and judgment affirmed.