**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**December 17, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.   **2024AP197**

Cir. Ct. No.  2020CV248

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT II**

CONTINENTAL PROPERTIES COMPANY, INC., CONTINENTAL 335 FUND LLC, CONTINENTAL 355 FUND LLC, CONTINENTAL 235 FUND LLC, CONTINENTAL 342 FUND LLC, CONTINENTAL 326 FUND LLC, CONTINENTAL 298 FUND LLC, CONTINENTAL 332 FUND LLC AND CONTINENTAL 347 FUND LLC,

   PLAINTIFFS-APPELLANTS,

 V.

HISCOX INSURANCE COMPANY, INC.,

   DEFENDANT-RESPONDENT.

APPEAL from a judgment of the circuit court for Waukesha County: MICHAEL J. APRAHAMIAN, Judge.  *Affirmed*.

Before Gundrum, Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. In this insurance coverage case, Continental Properties Company, Inc. (Continental Properties), et al., appeal from a circuit court judgment, entered on summary judgment, in favor of Hiscox Insurance Company, Inc. (Hiscox). They had accused Hiscox of breach of contract and bad faith with regard to a commercial crime insurance policy it had issued. For the reasons that follow, we affirm.

## BACKGROUND

¶2     Continental Properties is a Wisconsin company that develops and builds apartment communities across the country.[1] In 2007, it hired Angelo Eguizabal as its Vice President of Construction. In that role, Eguizabal was responsible for identifying and proposing general contractors to work with on various projects.

¶3     Prior to his employment at Continental Properties, Eguizabal worked with an individual named David Albertelli. In 2011, Albertelli contacted Eguizabal about a new company he had formed called Albertelli Construction, Inc. (ACI). Soon thereafter, ACI began providing consulting and construction services to Continental Properties.

¶4     In 2013, in an effort to incentivize Eguizabal to steer more business to ACI, Eguizabal and Albertelli entered into a "Commission Sales Agreement"

---

[1] The other appellants are project-specific limited liability companies formed and owned, in part, by Continental Properties. They were all insured under Hiscox's policy.

(CSA). Under its terms, ACI agreed to compensate Eguizabal for delivering Continental Properties' construction contracts to ACI. For multifamily contracts, ACI agreed to pay Eguizabal a "commission" of two percent of the total contract amount. ACI also allowed Eguizabal to retain any payments for change orders that exceeded the actual costs of executing the change order.[2] Finally, ACI permitted profit sharing on projects, assuming that the profits exceeded a certain threshold. It is undisputed, however, that this last provision was never triggered.

¶5 In 2015, Continental Properties grew dissatisfied with ACI's work and stopped awarding it contracts. According to Eguizabal, Albertelli affiliated himself with an existing contractor in California named Westcore Construction, LLC (Westcore), in the hopes of secretly continuing to work with Continental Properties. Eguizabal concealed this fact from Continental Properties, as he believed he would still receive payments from Westcore under the CSA. Continental Properties ended up hiring Westcore on several projects, which allegedly lost millions of dollars.

¶6 Eventually, Continental Properties became aware of both the CSA and Albertelli's relationship with Westcore. It fired Eguizabal and terminated its projects with Westcore. It also filed a lawsuit in federal court against Eguizabal, Albertelli, ACI, and Westcore, among others, alleging civil theft, fraud, conversion, theft by contractor, breaches of contracts, professional negligence, and claims under the Racketeering Influenced and Corrupt Organizations Act.

---

[2] The CSA contemplated that the change orders be legitimate. Indeed, Eguizabal testified that he never approved a change order that served no purpose.

¶7     To secure his dismissal from the federal lawsuit, Eguizabal entered into a cooperation agreement with Continental Properties.  Pursuant to that agreement, Eguizabal paid Continental Properties the monies he received under the CSA, which totaled $1,645,881.27.

¶8     In 2017, Continental Properties and its project-specific limited liability companies (collectively, the appellants) filed a proof of loss with their insurer Hiscox for losses ostensibly stemming from Eguizabal's conduct.  Hiscox had issued a commercial crime insurance policy insuring against employee theft.

¶9     Ultimately, Hiscox denied the appellants' claim, contending that it fell outside the scope of the insurance policy's coverage.  The appellants then filed this action against Hiscox, accusing it of breach of contract and bad faith.

¶10    After discovery, the parties filed competing motions for summary judgment.  Following briefing and a hearing on the matter, the circuit court granted Hiscox's motion and dismissed the action.  The court determined that the appellants had not demonstrated a covered loss under the insurance policy.  The appellants now appeal.  Additional facts are set forth below.

## DISCUSSION

¶11    We review a grant of summary judgment de novo, applying the same standard as the circuit court.  *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).  Summary judgment is appropriate if there are no

genuine issues of material fact and one party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2023-24).[3]

¶12 The interpretation of an insurance policy is a question of law that we also review de novo. *Everson v. Lorenz*, 2005 WI 51, ¶10, 280 Wis. 2d 1, 695 N.W.2d 298. In a claim for coverage under a policy, the insured bears the burden of showing initial coverage for the alleged loss. *American Fam. Mut. Ins. Co. v. Schmitz*, 2010 WI App 157, ¶8, 330 Wis. 2d 263, 793 N.W.2d 111.

¶13 We begin our analysis with the insurance policy at issue. Hiscox's policy to the appellants provides: "**We** will pay for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from **Theft** and/or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons." (Emphasis in original.) The policy defines "Theft" to mean "the unlawful taking of property to the deprivation of the Insured."

¶14 Per the language of the insurance policy, coverage applies to loss for theft "committed by an Employee," either acting alone or in collusion with others. Thus, for there to be coverage, the loss must result from a theft involving the employee. As the circuit court explained:

> If the employee is not directly involved in the theft, or if the alleged loss results from actions of others with whom the employee colluded but not tied directly to an employee's unlawful taking, then there is no coverage under the Policy. [However], losses beyond those seized by an employee may still be covered under the Policy if the losses directly result from the employee's unlawful taking aided by others, even if the monies went to people other than the employee.

---

[3] All references to the Wisconsin Statutes are to the 2023-24 version.

¶15 The other limitation on coverage is the language that promises payment for loss "resulting directly from Theft." When interpreting such language, Wisconsin courts have aligned themselves with the "direct means direct" rule and reject the contention that "direct" is synonymous with "proximate or substantial cause." *See Universal Mortg. v. Wurttembergische Versicherung AG*, 651 F.3d 759, 761-62 (7th Cir. 2011). This was made clear in the case of *Tri City National Bank v. Federal Insurance Co.*, 2004 WI App 12, 268 Wis. 2d 785, 674 N.W.2d 617.

¶16 In *Tri City*, two Tri City bank employees engaged in a scheme to fraudulently obtain mortgage loans for unqualified borrowers. *Id.*, ¶2. The scheme was discovered years later after multiple borrowers defaulted on the loans. *Id.* The mortgage companies sued Tri City, and the suits resulted in settlements. *Id.*, ¶¶3-5. Tri City then sought a declaratory judgment that its insurer, Federal Insurance Co., was obligated to indemnify it for the settlement payments pursuant to a fidelity bond Federal Insurance Co. had issued. *Id.*, ¶5. Through the course of that litigation, we interpreted language which stated that the bond covered, "*Loss resulting directly* from dishonest or fraudulent acts committed by an Employee[.]" *Id.*, ¶15 (emphasis added). Despite Tri City's contention that this language was ambiguous, we determined otherwise, stating:

> First, the bond clearly restricts indemnification to those losses that occur as a *direct result* of an employee's dishonest acts. This language is not susceptible to more than one meaning. Here, the loss was not direct. It was only after the mortgage defaults occurred, some three years after the employees' deceitful actions, that Tri City's liability to the mortgage companies came into being. The losses did not "*result[] directly* from dishonest or fraudulent acts committed by employe[es,]" *as the losses did not exist until the unsuitable mortgage holders defaulted on their loans and the mortgage companies sued Tri City.*

*Id.*, ¶18 (alterations in original; emphases added; footnote omitted). We continued:

> Tri City's losses—the settlements with the mortgage companies—are not the *direct result* of the employees' dishonesty; the employees were dishonest by permitting financially inappropriate people to obtain mortgages from other entities, not the employer bank. Thus, the bank initially lost nothing as a result of their dishonesty. It was only after the unsuitable mortgagees defaulted on their loans and the mortgage companies sued Tri City that "losses" resulted.

*Id.*, ¶24 (emphasis added).

¶17 The insurance policy at issue here, of course, is even more restrictive than the one addressed in *Tri City*. That is because it does not include coverage for "dishonest" acts.

¶18 With the foregoing in mind, we turn to the alleged losses identified by the appellants in the circuit court. Those alleged losses fall into four categories: (1) inflated contract payments to fund the two percent commission promised to Eguizabal under the CSA; (2) Continental Properties' payments to the Albertelli entities that were intended for subcontractors/vendors, but which were retained by Albertelli, causing Continental Properties to have to make additional payments; (3) Continental Properties' payments to the Albertelli entities for work they represented was complete, but was never performed, causing Continental Properties to have to make additional payments; and (4) losses from the Westcore projects, which would not have occurred but for Eguizabal's fraudulent concealment of Albertelli's relationship with Westcore. We consider each one in turn.

¶19     The first category of alleged losses is inflated contract payments to fund the two percent commission promised to Eguizabal under the CSA. According to the appellants, Eguizabal would embed the two percent commission in each of Continental Properties' contracts with the Albertelli entities, making them more expensive than they would otherwise be.

¶20     Although we agree that Eguizabal's purported conduct could constitute "Theft" under the insurance policy, we are not persuaded that the appellants have demonstrated a loss attributable to it.  To begin, Eguizabal returned the monies he received under the CSA as part of a cooperation agreement.  Moreover, his alleged actions involved providing confidential information, including other contractors' bids, to the Albertelli entities in order to let them "get to the number that they needed to get to" to secure Continental Properties' contracts.  Had Eguizabal not worked to surreptitiously undercut other contractors' bids, then Continental Properties would have likely secured another contractor with a higher bid—higher even than a bid with the two percent commission included.[4]

¶21     The appellants' expert witness did not take any of this into account in her report on damages.  Indeed, she did not calculate any losses associated directly with the two percent commission.[5]  As such, the alleged inflation of

---

[4] Eguizabal needed to undercut other contractors' bids because he lacked the authority to hire the Albertelli entities himself.  Such authority rested with Continental Properties' investment committee.

[5] The appellants' expert witness instead focused on losses tied to duplicative payments made to subcontractors, payments made to correct defective and incomplete work, and payments made to satisfy liens.

contract payments by the two percent commission is, at best, theoretical and not supported by evidence from which a factfinder could rely.

¶22     The next category of alleged losses is Continental Properties' payments to the Albertelli entities that were intended for subcontractors/vendors, but which were retained by Albertelli, causing Continental Properties to have to make additional payments.   The appellants accuse Eguizabal of creating an environment that allowed this to happen.[6]

¶23     We are not convinced that this second category of alleged losses is covered under the insurance policy.   After all, the losses did not result directly from a theft involving Eguizabal.   Rather, they resulted from a separate decision of Albertelli not to pay the subcontractors/vendors and instead retain the payments himself (effectively committing theft by contractor).   Such a decision, which is not contemplated in the CSA, is too far removed from Eguizabal to satisfy the direct causation rule of *Tri City*.

¶24     The next category of alleged losses is Continental Properties' payments to the Albertelli entities for work they represented was complete, but was never performed, causing Continental Properties to have to make additional payments.  Again, the appellants accuse Eguizabal of creating an environment that allowed this to happen.

¶25     This third category of alleged losses fails for the same reason as the second category.   That is because the alleged losses did not result directly from a

---

[6] In particular, the appellants fault Eguizabal for certain actions (e.g., accelerating payments to the Albertelli entities and allowing them to operate outside of Continental Properties' electronic payment system) that arguably made it easier for Albertelli to commit wrongdoing.

theft involving Eguizabal. Instead, they resulted from the Albertelli entities' subsequent failure to perform their promised obligations under contract. Again, that failure is too far removed from Eguizabal to satisfy the rule of *Tri City*.

¶26 The final category of alleged losses is from the Westcore projects, which would not have occurred but for Eguizabal's fraudulent concealment of Albertelli's relationship with Westcore. The appellants seek to recover all of their losses on those projects.

¶27 As noted by the circuit court, fraudulent concealment—i.e., not alerting Continental Properties of Albertelli's relationship with Westcore—is not theft and therefore not covered by the insurance policy. But even if it could be considered theft, the alleged losses did not result directly from it. At the time Westcore was hired, it could have completed the projects without the appellants incurring a loss. That is, everything could have gone according to plan despite Albertelli's involvement. As a result, we cannot say that the losses resulted directly from Eguizabal's conduct as required by *Tri City*.

¶28 In the end, because the appellants have failed to meet their burden of showing initial coverage for the alleged losses under the insurance policy, we are satisfied that the circuit court properly dismissed their action on summary judgment. Accordingly, we affirm.[7]

---

[7] To the extent we have not addressed an argument raised by the appellants on appeal, the argument is deemed rejected. *See State v. Waste Mgmt. of Wis., Inc.*, 81 Wis. 2d 555, 564, 261 N.W.2d 147 (1978).

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.